UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| INTERNATIONAL SOURCING GROUP LTD, | ) ) ) | |
| Plaintiff, | ) | Case No. 3:22-cv-318 |
| v. | ) ) | |
| WAREHOUSE HOLDINGS, INC., and JAMES ELLIOTT DAVIS, II, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff International Sourcing Group Ltd. brings this action against Defendants Warehouse Holdings, Inc. and James Elliot Davis, II, stating as follows.

## INTRODUCTION

1.     In the fly-by-night world of personal protective equipment sales during the pandemic, Defendants defrauded Plaintiff in a sham transaction for non-existent nitrile gloves. Plaintiff lost hundreds of thousands of dollars in purchase money and sustained damage to its reputation. As to the sham transaction, Plaintiff seeks damages and other remedies set forth herein.

## PARTIES

2.     Plaintiff is an Ohio limited liability company with a principal place of business at 30555 Solon Industrial Parkway, Solon, Ohio 44139.

3.     Plaintiff's member, Timothy Morgan, is a natural person and Ohio citizen, residing at 7320 Hillside Lane, Solon, OH 44139.

4.     Defendant Warehouse Holdings, Inc. ("Warehouse") is a Florida corporation with a principal place of business at 1015 Atlantic Blvd, Ste 516, Atlantic Beach, FL 32233.

5.     Defendant James Elliot Davis, II ("Davis") is a natural person and Florida citizen, residing at 39 Little Bay Harbor Dr, Ponte Vedra Beach, FL 32082.

## JURISDICTION AND VENUE

6.     There is complete diversity between the parties pursuant to 28 U.S.C. § 1332 because Plaintiff, and its member, is a citizen of Ohio and Defendants are citizens of Florida.

7.     The amount in controversy requirements of 28 U.S.C. § 1332 are satisfied because more than $75,000 is at issue, exclusive of costs, interest and attorneys' fees.

8.     This action properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1391 because facts giving rise to this action occurred within this District and Warehouse and Davis reside within this District.

9.     Venue is appropriate in this court.

## FACTS COMMON TO ALL ALLEGATIONS

10.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set out herein.

11.    Plaintiff is a distribution company which connects its customers to suppliers of products around the world.

12.    Defendant Warehouse was incorporated on May 5, 2021 and Warehouse purports to be a supplier of personal protective equipment. Defendant Davis is employed by Defendant Warehouse.

### Setting up the Sham Transaction

13.    On Tuesday, July 6, 2021, Plaintiff provided non-party brokers Geoff Clay, Zack Fonseca and Steven Lambert (collectively "Plaintiff's Brokers") with a purchase order for the supply of 18,200 boxes of Jiali brand nitrile gloves.

14.     The supplier would need to deliver the gloves to a redistribution company in Texas called Distribu, who was Plaintiff's customer. The price for the transaction was $3.10 per box, including delivery from California. Plaintiff's Brokers connected Plaintiff with Warehouse and Davis.[1]

15.     On July 6, 2021, Davis called Plaintiff's member Timothy Morgan on the telephone to confirm the purchase order.

16.     Later in the day on July 6, 2021, Davis and Clay called Morgan on the telephone to confirm that Morgan would wire payment to Warehouse for the contract price of $56,420 upon Davis's confirmation that the truck with the gloves was physically present at the warehouse in California and ready for pickup. During that call with Clay and Morgan, Davis represented that he arranged for an overnight truck pickup for the next day, on the morning of July 7, 2021.

17.     That same day, July 6, 2021, Clay suggested to Davis that for shipping, Davis should use one of Clay's contacts who had a good shipping relationship with FedEx Freight. Davis, however, told Clay that Davis would arrange the pickup through a company named "T-Force" because, as Davis told Clay, Davis had a 90% discount on freight due to the volume that he ships with T-Force.

**Fake Invoices and Fake TForce Truck Photos**

18.     On July 7, 2021, Davis sent Clay documents purporting to be commercial invoices and shipping paperwork for the transportation of the gloves that Plaintiff ordered. This included a pickup reference number, scheduled time, location, and other logistic information. On or around

---

[1] All allegations regarding actions taken by Davis are applied and incorporated by reference as actions taken jointly and severally by Davis individually and by Davis on behalf of Warehouse.

July 7, 2021, Davis asked Clay to send these documents to Morgan, which Clay did. The freight company listed was TForce.

19.     The following is a true and accurate copy of the forwarded WhatsApp message from Davis on July 7, 2021 with the purported shipping information from Davis which Clay forwarded to Plaintiff.



20.     Later in the day, on July 7, 2021, Davis wrote to Clay and Plaintiff via WhatsApp and stated, "Truck is at the warehouse" and "I'm waiting for photos." On July 7, 2021, Clay WhatsApp group-messaged Morgan stating, "are you tracking?" to which Davis responded, "Well tracking won't show anything as TForce won't update until it gets back to the hub."

21.     Approximately one hour later on July 7, 2021, Davis sent Clay and Morgan a photograph via WhatsApp of the blue loaded truck that Davis represented was the TForce Freight truck for Plaintiff's purchase.

22.     The following graphics are true and accurate representations of WhatsApp communications from Davis to Clay and Plaintiff dated July 7, 2021.





23.     On July 7, 2021, approximately 15 minutes after Davis sent the photographs of the blue TForce truck purportedly loaded with the gloves pursuant to Plaintiff's order, Clay called Plaintiff to make sure Plaintiff was aware that the truck was being loaded and therefore Plaintiff should send the wire for payment.

24.     Shortly thereafter, on July 7, 2021, a telephone call occurred among Davis, Clay, Morgan and additional non-party brokers Menusha Gunawardhana and Fonseca. On this call, Davis stated that he had prepaid for the product and he was getting an incredible price due to the status of the product as "closeout inventory." Morgan informed the group that he had not yet received the funds from his client (Distribu) for the order. In response, Davis pressured Morgan for payment and threatened to sue Morgan in the absence of payment. In good faith, Morgan volunteered to wire $10,000 of Plaintiff's own funds to Warehouse as a credit against the amount owed for the Distribu order.

25.     After the call, Davis stated the following on July 7, 2021 in a WhatsApp message among Davis, Clay, Gunawardhana and Fonseca: "All parties agreed on the phone just now verbally that $10,000 would be wired to my company to release product. Upon delivery, before product can be unloaded, the remaining balance must be paid for in full."

26.     The following is a true and accurate copy of that July 7, 2021 WhatsApp message:



27.     Plaintiff wired the $10,000 to Defendant Warehouse's SunTrust Bank account on July 7, 2021 as agreed.

**Davis Falsely Represents the Presence of Additional Product to Induce Additional Payment**

28.     On July 8, 2021, Davis informed brokers Clay, Fonseca and Lambert that the truck with the gloves for Plaintiff's order was being held at the main hub in California, awaiting payment of the balance of the invoice. In making the statement to brokers Clay, Fonseca and Lambert, Davis intended for the information to be conveyed to Plaintiff. Davis also intended for Plaintiff to rely on this representation, which was known to be false, to induce Plaintiff into making payment.

29.    Also on July 8, 2021, Davis wrote to Morgan and Plaintiff's Brokers via WhatsApp the following: "Good morning.  Tell Joe [from Distribu] I want the wire in the next 2 hours." In the same group WhatsApp message on July 8, 2021, at Davis's direction, Clay wrote to Morgan stating "please respond in here...the truck is about to get recalled if we don't hear from you directly, and you're going to forfeit $10,000. We all want the same thing, but not responding is only making this situation a lot worse."

30.    Davis responded to the group WhatsApp message on July 8, 2021, "I'd call Joe." Clay responded to Davis, "I don't have Joe's phone number but happy to do this if one of us has his number directly." Morgan responded, "I am waiting on the confirmation from Joe. I will keep you updated."

31.    The following is a true and accurate representation of that WhatsApp message.



32.     On Friday, July 9, 2021, Morgan, Clay and Davis exchanged messages via WhatsApp. Morgan said, "I have been driving and need to get back on the road. Tami [from Distribu] said she confirmed the wire to [Defendant] Jim [Davis]." The wire was for $56,420.

33.     On July 9, 2021, Clay responded with a thumbs up and smiley face emoji. Davis then responded "The wire was sent? I haven't gotten a confirmation from anyone. I am concerned." Clay responded "same." Davis asked, "Where is the wire." Morgan responded later that evening "I just made it back to my office I assume that you have all of the money."

34.     The following is a true and accurate representation of the July 9, 2021 WhatsApp messages.



35.     That same day on July 9, 2021, Plaintiff's brokers reached out to Joe and Tami Artega of Distribu and arranged for payment to Warehouse.

36.     The following Monday, July 12, 2021, Warehouse received payment from Distribu in the amount of $56,420 via a wire transfer to Warehouse's SunTrust Bank account.  This is the same bank account that received Plaintiff's initial $10,000 wire.

## Alleged Delays in Alabama and California

37.     On July 13, 2021, a telephone call occurred among Davis, Clay, and Distribu representatives Joe Artega, Tami Artega and Shane Stevens. Intending for Plaintiff to rely on his representation, Davis told the group during the call that shipping was on track to be delivered by the end of the week. Tami Artega requested during the call that the truck be scheduled to arrive on July 19, 2021.

38.     On July 19, 2021, Clay asked Davis if the boxes were getting delivered that day. Davis represented to Clay, intending for Clay to relay the message to Plaintiff and for Plaintiff to rely on it to induce action, that there were delays getting the shipment out of California due to shortages of drivers and trucks. Davis further stated he was working on alternative routing and would try to have the shipment pulled from an Alabama warehouse. Davis told Clay, knowing and intending for Clay to relay the message to Plaintiff and for Plaintiff to rely on it, that Davis had spoken directly with Joe Artega of Distribu, that everything was okay with Distribu and that the shipment would arrive soon.

39.     Also on July 19, 2021, Plaintiff had another customer in need of Jiali nitrile gloves and he brought this order to Davis. This second order was for a customer named Tiger Paper and the order amount was for four truckloads of Jiali gloves. On July 19, 2021, Davis represented to

Plaintiff that if Plaintiff paid for this order of gloves by 11:00 a.m. on July 20, 2021, the gloves would ship and be delivered to Plaintiff's client by July 23, 2021.

40.     On July 20, 2021 at 10:18 a.m., Plaintiff paid Defendant Warehouse $185,750 for the four truckloads of gloves via wire transfer to the same Warehouse SunTrust Bank account.

41.     Also on July 20, 2021, Davis represented to brokers Clay, Lambert and Fonseca, intending for them to convey the message to Plaintiff and for Plaintiff to rely on it, that all the product was prepaid and that 72,000 boxes would be shipping.

42.     Davis, however, then stated to Plaintiff's Brokers on July 20, 2021 that there was an issue getting the trucks into Alabama to pick up the original Distribu order. Therefore, Davis told Plaintiff's Brokers on July 20, 2021, with the intent that the Brokers transmit the message to Plaintiff and that Plaintiff rely on it, that that Davis would work on getting the trucks out of California.

43.     On July 21, 2021, Davis represented to Plaintiff's Brokers, with the intent that the Brokers transmit the message to Plaintiff and that Plaintiff rely on it, that there were more issues with the shipment. Davis asserted to the Brokers that due to a purported "paperwork error," only one truck was deployed for the job. Davis further stated that he would try to pull the other trucks from California on an expedited basis so that they would still make it to Distribu by July 23, 2021.

**The Brokers Become Suspicious**

44.     On July 22, 2021, Clay and Lambert became suspicious of Davis's representations and the Brokers compared their respective notes and details of Davis's representations.

45.     On July 23, 2021, Davis sent brokers Clay and Lambert a purported wire confirmation. Davis represented that he had wired $35,000 to Lambert's bank in Toronto in the afternoon of July 22, 2021. However, Lambert never received this purported wire.

46.    On July 23, 2021, Clay and Lambert spoke with each other by telephone. Lambert had been speaking with TForce and Lambert was informed that the picture of the "TForce" blue truck that Davis sent, depicting the alleged pickup of the first order on July 7, 2021, was not a TForce truck.

47.    It was further related to Lambert that Davis had reached out to other unrelated seller groups and Davis asked for pictures of trucks being loaded. Lambert discerned that the bills of lading sent by Davis as purported proof that the product was moving were later cancelled by Davis before any trucks arrived at the warehouse.

### Defendant Fails to Deliver and Plaintiff Attempts to Retract the Wire

48.    On July 23, 2021, brokers Clay and Lambert called Plaintiff and explained their suspicions given that Davis's paperwork indicating that the pickups were getting cancelled. Clay and Lambert suggested that Morgan call his bank and retract the wire for the $185,750 Tiger Paper order.  Plaintiff called its bank and attempted to retract the wire for the $185,750 to Warehouse.

49.    Also on July 23, 2021, Plaintiff paid $2,875 to KOL Global Logistics, Inc. for shipping costs that were supposed to be included in the prices quoted by Defendant Warehouse.

50.     Meanwhile, on July 23, 2021 Davis told Clay and Lambert, intending for them to convey the message to Plaintiff and for Plaintiff to rely on it, that the product for Plaintiff's orders was available and ready for pickup at the Alabama warehouse.

51.    On July 24, 2021, Davis called Lambert and asserted that Warehouse's accounts at SunTrust were frozen and Davis asked if Lambert knew why. Davis stated that he was hoping no one did something "stupid" because of "problems with getting things scheduled."

52.    On July 25, 2021, Clay sent a text message to Tami Artega of Distribu asking if Distribu had received their shipment. Tami Artega did not confirm receipt of Distribu's shipment.

53.     On July 26, 2021, Davis demanded to Plaintiff's Brokers that Plaintiff call its bank and un-retract the wire payment to Warehouse for the Tiger Paper order.

54.     That same day, July 26, 2021, Clay verified with Shane Stevens at Distribu that Distribu still had not received the order for which Distribu paid Warehouse $56,420 on July 9, 2021.

**Defendant Failed to Provide Proof that the Gloves were ever Purchased**

55.     On July 26, 2021, brokers Clay and Lambert began more aggressively asking Davis for proof that Warehouse actually paid for the product. Clay and Lambert asked Davis for any verifiable documentation, preferably a bank statement, showing that wires went out to pay for the gloves.

56.     In response, on July 26, 2021, Davis began changing his stories in his statements to Clay and Lambert. First, Davis stated to Clay and Lambert that Davis was in Orlando and that Davis's fiancée's father needed chemotherapy treatments but Davis could not pay for the chemotherapy because his accounts were frozen. Davis also told Clay and Lambert that "of course" Davis has copies of all the wire confirmations showing payment of the gloves and that Davis would send them as soon as he returned to Jacksonville.

57.     Later on July 26, 2021, Davis told brokers Clay and Lambert that Davis's business partner would go to Davis's house and retrieve documents proving that Warehouse paid for "everything" pertaining to Plaintiff's orders. Later that day, Davis asserted to Clay and Lambert that some of Davis's wire transfers had bounced back due to suspected fraud. Clay and Lambert asked for copies of statements reflecting a paper trail of Warehouse's initiated wires, even if they had bounced back. Davis did not provide the proof.

58.     On July 27, 2021, Clay spoke by telephone with Kevin Orford, vice president of the shipping and logistics company KOL Global Logistics, Inc. Orford confirmed that there were at least 300 pallets of Jiali gloves available at the Alabama warehouse.

59.     That same day, on July 27, 2021, Davis continued to assert to Plaintiff's Brokers that Davis could provide proof that he had sent wires to the suppliers to purchase the inventory. Davis claimed that the supplier sent him four invoices and that Davis sent four wires, but three of the wires purportedly bounced back due to banking issues. Davis told Plaintiff's Brokers that Davis would be driving back to Jacksonville overnight and would provide full paperwork upon his arrival in Jacksonville.

60.     On July 28, 2021, Davis again told Plaintiff's Brokers that Davis "of course" has the paperwork to prove that he purchased the inventory. But Davis failed to produce the paperwork. That same day, broker Clay told Davis that if Davis goes to Warehouse's bank and explains the situation, Warehouse's bank should provide Davis with screenshots or some sort of proof to allow Davis to clarify the matter and prove that Davis had paid for the product. In response, Davis began threatening to take legal action. Davis even threatened to involve the Florida state governor.

61.     Also on July 28, 2021, Clay expressed to Davis that perhaps companies with whom Davis has conducted business with would find their accounts frozen too, due to the bank's investigation into Clay and Warehouse. Clay made these statements to Davis as a test to determine whether Davis would run with the story and assert that other companies' accounts were also frozen. Two hours later, Davis indeed told Clay that the accounts of other companies with whom he did business are also being frozen.

62.     On July 29, 2021, Davis told Plaintiff's Brokers again that his bank was clawing back funds from anyone to whom Davis sent wires in the last month.

**Plaintiff Pays for Replacement Gloves**

63.     On July 30, 2021, Plaintiff mitigated its damages and paid $72,500 via a wire to supplier Global PPE Inc. as a replacement for the gloves that Warehouse failed to supply for Distribu and Tiger Paper.

64.     That same day, Plaintiff also paid $3,450 to shipping company Xport for shipping costs that were supposed to be included in the order from Warehouse.

**Defendant Attempted to Payoff the Brokers**

65.     On August 3, 2021, Davis reached out to broker Lambert and told Lambert that Davis has a $1,000 commission for both Lambert and Clay. Davis asserted that he would deposit a cashier's check for the commission if Plaintiff's brokers sent Davis their banking information. Lambert and Clay did not provide Davis with their banking information, however, as Lambert and Clay suspected Davis had engaged in fraud.

66.     On August 4, 2021, Davis reached out again to Clay and Lambert asking for their banking or PayPal information so that Davis could send them commission payments. Clay and Lambert refused to provide their information.

**More Costs Incurred and Failures of Defendant to Pay**

67.     On August 5, 2021, Plaintiff paid an additional $3,875 via wire transfer to Global PPE Inc. for replacement gloves that Warehouse failed to supply. That same day, Plaintiff paid an additional $6,250 to Xport for shipping costs that were supposed to be included in the deal with Warehouse.

68.     On August 18, 2021, Davis exchanged WhatsApp communications with Plaintiff, Plaintiff's brokers and a representative from Distribu named Sam Swissa. Davis attempted to

negotiate a payment plan for the money which Warehouse had retained belonging to Plaintiff and Distribu. At this time, Warehouse had received funds from Plaintiff and Distribu but failed to deliver any gloves. In response to Davis's request for a payment plan, Swissa responded, "You agree to pay $7k a week I told you clearly after you send a payment I'll send you the contract stop telling me BS.  You think we are stupid we don't want you to be in jail we want our money back."

69.     However, despite requesting a payment plan, Davis and Warehouse did not make any $7,000 payment, or any other payment. Davis and Warehouse retained the money and did not state an intention to perform. On August 18, 2021 via WhatsApp, Davis referred Plaintiff, Plaintiff's brokers and Swissa to a person described by Davis as Davis's personal lawyer, purportedly one "Lee G Kellison, Esq. (599 Atlantic Blvd # 4, Atlantic Beach, FL 32233)."

70.     On August 19, 2021, Plaintiff called Kellison and Kellison stated he had not been retained by Davis or Warehouse. Plaintiff informed Davis that Kellison denied having been retained. Davis then asserted that he retained Kellison later that day. The following is a true and accurate representation of this WhatsApp communication on August 19, 2021:



71.    On August 30, 2021, Plaintiff received $54,478.14 back from SunTrust, out of the $185,750 paid, pursuant to Plaintiff's wire recall. The $131,271 deficiency owed by Davis and Warehouse remains outstanding, as Davis and Warehouse already removed Plaintiff's money before the bank could recall the funds.

## Davis Goes to Mexico

72.    Still in possession of Plaintiff's money after failing to deliver the gloves, Davis traveled to Cabo, Mexico. Davis subsequently changed his Facebook profile picture below with the caption "Always on Cabo Time."



https://www.facebook.com/CharmOfTheSouth.

73.     To date, Davis and Warehouse have failed to return Plaintiff's money.

**Plaintiff's Damages**

74.     Plaintiff's damages include, without limitation, the $10,000 wire Plaintiff sent to Warehouse's SunTrust account on July 7, 2021 and the $185,750 wire Plaintiff sent to Warehouse's SunTrust account on July 20, 2021, reduced by the $54,478 wire recall from SunTrust on August 30, 2021.

75.     Plaintiff's damages also include the $72,500 wire Plaintiff sent to Global PPE Inc. on July 30, 2021 and the $52,000 wire Plaintiff sent to Global PPE Inc. on August 5, 2021 for replacement gloves that Warehouse was supposed to provide, as well as the $2,875 Plaintiff paid KOL Global Logistics, Inc. on July 23, 2021, the $3,450 Plaintiff paid to Xport on July 30, 2021 and the $6,250 Plaintiff paid to Xport on August 5, 2021 for shipping costs that were supposed to be included in the deal with Warehouse.

76.     Moreover, Plaintiff's customer Tiger Paper has threatened to sue Plaintiff for damages resulting from Warehouse's failure to timely provide the gloves. Tiger Paper asserted that it is still owed around $70,000. Plaintiff has already expended over $125,000 trying to satisfy Tiger Paper given that due to Defendants' failure to deliver the product, Plaintiff was unable to deliver the product to Plaintiff's client. Of the $125,000 in damages, Plaintiff sourced alternate supplies and also paid Tiger Paper cash in the approximate amount of $42,000.

77.     Plaintiff has engaged counsel and agreed to pay reasonable attorneys' fees.

## COUNT ONE – FRAUD
### Against Defendant Davis

78.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

79.     Davis made false representations of material fact to Plaintiff and to non-parties with the intent that those non-parties convey Davis's false representations to Plaintiff as set forth in detail herein.

80.     Davis was aware of the falsity of the representations at the time they were made. The representations were willful and the conduct was willful, intentional and undertaken with malice and in bad faith and with a wanton and reckless disregard and callous indifference for Plaintiff's rights.

81.     As set forth herein, Davis made the unlawful, unfair and false representations to intentionally defraud and deceive Plaintiff and to induce Plaintiff to act or to forbear action it otherwise would not have taken.

82.     Plaintiff relied on Davis's misrepresentations and Plaintiff's reliance was reasonable and justifiable.

83.     Plaintiff would not have taken actions, inactions, and/or omissions which resulted in harm and damages to Plaintiff, if not for Davis's misrepresentations.

84.     Davis's actions are extreme and outrageous and designed to willfully, knowingly and maliciously injure and cause harm to Plaintiff.

85.     Plaintiff suffered actual damages exceeding $200,000 as a result of Davis's fraudulent misrepresentations.

## COUNT TWO – FRAUD
### Against Defendant Warehouse

86.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-85 of the Complaint as if fully set out herein.

87.     All of Davis's fraudulent acts occurred within the scope of his employment with Warehouse.

88.     All of Davis's fraudulent acts occurred during Davis's employment with Warehouse and to further the interests of Warehouse.

89.     All of Davis's fraudulent acts occurred with the apparent authority of Warehouse.

90.     Plaintiff suffered actual damages exceeding $200,000 as a result of Davis and Warehouse's fraudulent misrepresentations.

## COUNT THREE – NEGLIGENT MISREPRESENTATIONS
### Against Defendant Davis

91.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

92.     Davis made false representations of material fact to Plaintiff, as set forth above in detail.

93.     Davis was aware of the falsity of the representations at the time they were made. The representations were willful and the conduct was willful, intentional and undertaken with malice and in bad faith and with a wanton and reckless disregard and callous indifference for Plaintiff's rights.

94.     As set forth above, Davis made the unlawful, unfair and false representations to intentionally defraud and deceive Plaintiff and to induce Plaintiff to act or to forbear action they otherwise would not have taken. In the alternative, Davis made assertions of fact with no reasonable ground for believing them to be true.

95.     Plaintiff relied on Davis's misrepresentations and Plaintiff's reliance was reasonable and justifiable.

96.     Plaintiff would not have taken actions which resulted in harm and damages to Plaintiff, if not for Davis's misrepresentations.

97.     Plaintiff suffered actual damages exceeding $200,000 as a result of Davis's negligent misrepresentations.

## COUNT FOUR – NEGLIGENT MISREPRESENTATIONS
### Against Defendant Warehouse

98.     Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 and 91 through 97 of the Complaint as if fully set out herein.

99.     All of Davis's negligent acts occurred within the scope of his employment with Warehouse.

100.     All of Davis's negligent acts occurred during Davis's employment with Warehouse and to further the interests of Warehouse.

101.     All of Davis's negligent acts occurred with the apparent authority of Warehouse.

102.    Plaintiff suffered actual damages exceeding $200,000 as a result of Davis and Warehouse's negligent misrepresentations.

## COUNT FIVE – BREACH OF CONTRACT
### Against Warehouse

103.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

104.    Plaintiff and Warehouse entered into binding and enforceable agreements for Warehouse to supply Jiali brand gloves to Plaintiff. These agreements required Warehouse to supply 18,200 boxes of Jiali brand gloves to be delivered to Distribu and 72,000 of boxes to be delivered to Tiger's customer Swish White River Inc.

105.    Plaintiff performed its contractual obligations.

106.    Plaintiff satisfied all conditions precedent or all conditions precedent have been excused.

107.    Warehouse materially breached the agreements as discussed herein.

108.    As a result of Warehouse's breaches, Plaintiff has been damaged.

109.    Plaintiff incurred incidental damages and consequential damages in the combined amount exceeding $200,000.

## COUNT SIX – QUANTUM MERUIT/UNJUST ENRICHMENT
### Against Defendant Warehouse

110.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

111.    This count is pled in the alternative to Count Six.

112.    Plaintiff conferred a benefit on Warehouse, who had knowledge thereof.

113.    Warehouse voluntarily appreciated, accepted and retained the benefit conferred.

114.    The circumstances as such that it would be inequitable for Warehouse to retain the benefit without first paying the value thereof to Plaintiff. The unjust enrichments should be disgorged.

115.    Plaintiff was damaged in the principal amount exceeding $200,000.

## COUNT SEVEN – QUANTUM MERUIT/UNJUST ENRICHMENT
### Against Defendant Davis

116.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

117.    This count is pled in the alternative to Count Six.

118.    Plaintiff conferred a benefit on Davis, who had knowledge thereof.

119.    Warehouse voluntarily appreciated, accepted and retained the benefit conferred.

120.    The circumstances as such that it would be inequitable for Davis to retain the benefit without first paying the value thereof to Plaintiff. The unjust enrichments should be disgorged.

121.    Plaintiff was damaged in the principal amount exceeding $200,000.

## COUNT EIGHT – VIOLATION OF FLORIDA'S DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. 501.201
### Against Defendant Warehouse

122.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

123.    Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is designed to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

124.    Under FDUTPA, "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade of commerce are hereby declared unlawful."

125.    Plaintiff is a "consumer" under FDUTPA.

126.    The commercial dealings discussed herein between Plaintiff and Warehouse constitute a "transaction" governed by FDUTPA.

127.    Warehouse committed deceptive acts and engaged in unfair practices as discussed herein.

128.    Warehouse's fraudulent conduct and deceptive and unfair trade practices were the actual and proximate cause of substantial damage to Plaintiff, as discussed herein.

129.    Moreover, Warehouse's misconduct was intentional and extreme and outrageous. It was undertaken with knowing disregard for Plaintiff's substantive rights and was done intentionally to inflict a financial injury upon Plaintiff.

130.    Warehouse had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury and damage.

131.    Warehouse's conduct was so reckless and wanting in care that it constituted a conscious disregard or indifference to the rights of Plaintiff, who was exposed to such conduct.

132.    As a result of Warehouse's actions, Plaintiff has been damaged in the principal amount exceeding $200,000.

133.    Warehouse should be assessed civil penalties of $10,000 for each violation of FDUTPA.

134.    As a result of Warehouse's actions, Plaintiff is entitled to recover reasonable attorneys' fees and costs incurred in bringing this action.

## COUNT NINE – BREACH OF THE IMPLIED
## COVENANT OF GOOD FAITH AND FAIR DEALING
### Against Defendant Warehouse

135.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

136.    There existed valid contracts for Warehouse to supply Jiali gloves, which are enforceable by Plaintiff against Warehouse.

137.    Under the contracts, Warehouse was responsible for timely supplying the boxes of gloves.

138.    An implied covenant of good faith and fair dealing exists to protect Plaintiff's reasonable expectations for the agreements.

139.    Warehouse breached its implied covenant of good faith and fair dealing by failing to timely perform, lying about its ability to perform and retaining the money in bad faith.

140.    No reasonable supplier in Warehouse's situation would take the actions it did. Warehouse's wrongful actions prevent Plaintiff from reaping the fruits of the agreement for which the parties bargained.

141.    As a direct and proximate result of Warehouse's breaches of its duty of good faith and fair dealing, Plaintiff has sustained substantial damages and continue to suffer substantial damages. Those damages include costs and attorneys' fees as well as incidental and consequential damages.

## COUNT TEN – CONVERSION
### Against Defendant Warehouse

142.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

143.    Plaintiff had the right to possess the personal property funds that they paid to Warehouse to supply the Jiali gloves but which Warehouse failed to use to supply the gloves.

144.    Warehouse was obligated to keep intact or deliver Plaintiff's specific money in question so that it could be identified and used solely for supplying the gloves.

145.    Warehouse intentionally interfered with the Plaintiff's funds and asserted dominion and control thereof which was inconsistent with Plaintiff's rights to possession.

146.    The interference deprived Plaintiff of its lawful possession or use of the funds.

147.    Warehouse's conversion went beyond and was independent from its failure to comply with the contractual obligations to Plaintiff.

148.    As a direct and proximate result, Plaintiff has sustained substantial damages and continues to suffer substantial damages. Those damages include costs and attorneys' fees as well as incidental and consequential damages.

## COUNT ELEVEN – CONVERSION
### Against Defendant Davis

149.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

150.    Plaintiff had the right to possess the personal property funds that they paid to Davis to supply the Jiali gloves but which Davis failed to use to supply the gloves.

151.    Davis was obligated to keep intact or deliver Plaintiff's specific money in question so that it could be identified and used solely for supplying the gloves.

152.    Davis intentionally interfered with the Plaintiff's funds and asserted dominion and control thereof which was inconsistent with Plaintiff's rights to possession.

153.    The interference deprived Plaintiff of its lawful possession or use of the funds.

154.    Davis's conversion went beyond and was independent from its failure to comply with the contractual obligations to Plaintiff.

155.    As a direct and proximate result, Plaintiff has sustained substantial damages and continues to suffer substantial damages. Those damages include costs and attorneys' fees as well as incidental and consequential damages.

## COUNT TWELVE – RESCISSION
### Against Defendant Warehouse

156.    Plaintiff incorporates by reference all the allegations in Paragraphs 1-77 of the Complaint as if fully set out herein.

157.    This count is plead in the alternative to all other counts.

158.    This is a claim for rescission of any and all contractual agreements between Plaintiff and Warehouse and a refund of all money that Plaintiff paid to Warehouse.

159.    In this claim for rescission, Plaintiff seeks to restore the status quo ex ante, and Plaintiff seeks the return of at least $130,000.00 improperly charged or obtained by Warehouse.

160.    Rescission is an equitable remedy and the prime object of rescission is "to undo the original transaction and restore the former status" of the parties. Plaintiff has not waived their claim to the relief claimed herein. And if any such waiver is asserted to exist, such alleged waiver was obtained by Warehouse through fraud and other wrongful conduct as described herein.

161.    Plaintiff and Warehouse entered into contractual agreements. There exists fraud, false representations by Warehouse, and/or other equitable grounds for rescission or cancellation of the contractual agreements.

162.    The contractual agreements between Plaintiff and Warehouse are void and voidable.

163.    Plaintiff has rescinded the contractual agreements and Warehouse knows and/or has been informed and/or is being informed that the contractual agreements have been rescinded and cancelled.

164.    Plaintiff desires to rescind and void, and have rescinded and voided, the contractual agreements.

165.    For purposes of this count, pled in the alternative, Plaintiff has no adequate remedy at law.

166.    Pursuant to rescission and to restore the status quo, Warehouse should be ordered to refund the over $130,000.00 unlawfully charged to Plaintiff pursuant to the void, rescinded and/or unenforceable contractual agreements.

167.    Pursuant to the rescission and to restore the status quo, Warehouse should also be ordered to pay all incidental and consequential damages exceeding $200,000, as set forth herein.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant as follows:

      A.  Plaintiff respectfully requests that the Court enter judgment for principal damages against both Defendants, jointly and severally, in an amount exceeding $200,000;

      B.  In the alternative and/or in addition, Plaintiff respectfully requests that the Court grant rescission of the contracts to supply gloves and that Defendants must return to Plaintiff all money paid to Defendants by Plaintiff, in excess of $130,000;

      C.  Plaintiff respectfully requests that the Court enter an award of Plaintiff's reasonable attorneys' fees, payable by both Defendants, jointly and severally;

D.  Plaintiff respectfully requests that the Court award all costs and prejudgment interest against both Defendants, jointly and severally;

E.  Plaintiff respectfully requests that the Court award all statutory relief and damages against all Defendants, jointly and severally; and,

F.  Plaintiff respectfully requests that the Court grant such other and further relief that the Court finds just and proper.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:    */s/ Kenneth E. Chase*
Kenneth E. Chase
Florida Bar No. 0017661
Chase Law & Associates, P.A.
1141 71st Street
Miami Beach, FL 33141
Tel: (305) 402-9800
Fax: (305) 402-2725
Email: kchase@chaselaw.com